FISH BROS. WAGON COMPANY, Respondent, vs. LA BELLE WAGON WORKS and others, Appellants.

*May 27 — June 15, 1892.*

*Trade-marks and trade names.*

1. The business of the firm of Fish Bros., wagon manufacturers at Racine, together with all the property and assets, passed to Fish Bros. & Co., Agents, thence into the hands of a receiver, thence to the Fish Bros. Wagon Co., a corporation. The Fish brothers remained in the business through the successive changes, and became officers of the corporation, although the majority of the stock was owned by others. During all this time the wagons were marked "Fish Bros.," "Fish Bros. & Co., Agents," or "Fish Wagons," or with the picture of a fish on which were the words "Bros.," "Bros. & Co.," or "Wagon," and were advertised under those names and with said picture. Several years after the organization of the corporation the Fish brothers withdrew therefrom and formed a partnership to manufacture and deal in wagons in another place, under the name of Fish Bros. & Co. In an action against them by the corporation, it is *held* that the latter had acquired the good will of the original business and the right to use the said names and picture as trademarks, although the same were not specifically mentioned in any of the transfers of the business to the corporation.

2. But, there having been no agreement giving the corporation the exclusive right to use such names and picture as trade-marks, the new firm also has the right to use the same in advertising and upon their wagons, provided they do not use them in a way calculated to induce persons to buy their wagons as and for those manufactured by the corporation. The picture of a fish is to be regarded merely as another way of designating the surname Fish. WINSLOW, J., dissents.

3. The new firm has, however, no right to represent their present business as being the same as that formerly conducted by them in Racine.

APPEAL from the Circuit Court for *Douglas* County.

In 1863 the defendant *Titus G. Fish* and one Bull, under the firm name of Fish & Bull, commenced the business of manufacturing wagons in the city of Racine. As such

firm, they employed one *Edwin B. Fish*, a brother of *Titus G.* About 1864 Bull went out of the firm, and Abner C. Fish, a brother of *Titus G.*, became a member thereof, and they continued the business of manufacturing wagons under the firm name of Fish Bros., and as such continued *Edwin B. Fish* as an employee. About 1868 *Edwin B. Fish* became a member of the firm of Fish Bros. About that time the firm became embarrassed, and thereupon entered into an agreement with Jerome I. Case, whereby Fish Bros. transferred to Case all the personal property they then had in the wagon-making business at Racine, and he advanced a large amount of money for the purpose of carrying on said business under an agreement in writing whereby said business was thereafter to be carried on by Fish Bros., acting as his agents, and they to draw out a certain amount per year for the support of their respective families, and to have the privilege of redeeming the property and the business or repurchasing the same upon payment to· Case of the amount advanced and the interest agreed upon as stipulated. The business was thereupon conducted by and in the name of " Fish Bros., Agents." About 1872 or 1873 one Huggins became a member of said firm and the same became known as " Fish Bros. & Co., Agents," composed of *Titus G.*, Abner C., *Edwin B. Fish*, and John C. Huggins.

In 1878 the catalogue used by said Fish Bros. & Co., Agents, had thereon a picture of *Titus G. Fish* on the left-hand corner, and underneath the picture were the words, " *Titus G. Fish*, founder of the firm of Fish Bros. & Company, 1864," and upon the right-hand side of the picture was "1878," being the date of the catalogue. There was also the picture of a fish on the catalogue and cars. Such pictures and statements were continued on subsequent catalogues down to the time of the incorporation of the plaintiff. In 1880 the wagons and vehicles so manufactured by

·Fish Bros., Agents, and by Fish Bros. & Co., Agents, had become somewhat celebrated to the trade, so that in 1880 they manufactured and sold about 15,000 in different parts of the country, and the capital involved in the business then was about half a million.

In 1880 a disagreement arose between Jerome I. Case and Fish Bros. & Co., Agents, as to their respective rights under said agreement, and thereupon Case commenced a suit against Fish Bros. & Co., which twice came to this court, and will be found reported in 58 Wis. 56, and 63 Wis. 475. In 1882 or 1883 Abner C. dropped out of the firm, and D. J. Morey and S. S. Lyon became members thereof, under the firm name of Fish Bros. & Co., composed of *Titus G.* and *Edwin B. Fish,* Huggins, Morey, and Lyon. The business was conducted and managed by Fish Bros. & Co., Agents, until after the first decision in this court. On October 16, 1883, Jerome I. Case was appointed a receiver, and took possession of all the property standing in the name of Fish Bros. & Co., Agents, or otherwise represented in said business, and excluded the members of said firm therefrom otherwise than as employees. Case continued such receiver down to September 26, 1885, when he resigned, and A. W. Hall was appointed in his place, and he continued the same as such receiver, advertising the business as " Fish Bros. & Company ; A. W. Hall, Receiver ; *T. G. Fish*, Superintendent ; " and placing on the wagons and their catalogues " Fish Bros.," " Fish Wagons," " Fish Bros., Agents," " Fish Bros. & Company, Agents," and the picture of a fish with " Bros." on it, or " Bros. & Co." *Titus G. Fish* continued in the employ of said Hall as such receiver during his entire connection with the business.

In January, 1887, one O. R. Johnson purchased from the receiver all the personal property of the business of Fish Bros. & Co., including accounts and bills receivable, etc.,

and also purchased most of the outstanding claims of the creditors; and on January 28, 1887, the plaintiff, *Fish Bros. Wagon Company*, became incorporated under ch. 86, R. S., for the manufacture and sale of wagons at Racine, with *Titus G.* and *Edwin B. Fish*, Johnson, Booth, and Deane as stockholders, which corporation had a capital stock of $250,000. *Edwin B. Fish* and one *Fred. C. Fish*, a son of said *Titus G.*, were employed in the business. Johnson was the principal stockholder and president of the company. Booth was secretary, *Titus G. Fish* vice president and manager, Deane treasurer, and *Edwin B. Fish* superintendent. *Titus G.*, as such manager, made an illustrated catalogue having thereon, " *Fish Bros. Wagon Company*, Racine, Wisconsin;" the picture of a fish, with the word " Wagon " thereon; a portrait of *Titus G. Fish*, with the figures " 1864 " on the left and " 1888 " on the right; together with the words, " *Titus G. Fish*, founder of the Fish Bros. Wagon," in the middle; also with the words, " The Fish Bros. Wagon," " Fish Bros. & Company, Racine, Wisconsin," and the picture of a fish with " Fish Bros. Wagon Company, Racine, Wis." thereon, and another picture of a fish with " Bros." thereon, and another picture of a fish with " Bros. & Co." thereon. The articles of incorporation of said plaintiff company are dated January 27, 1887, and signed by Johnson, Booth, *Titus G. Fish*, and *Edwin B. Fish*. On April 22, 1887, Hall, as such receiver, deeded the real estate connected with said business to O. R. Johnson, in pursuance of the order of the court and a public sale at auction, April 7, 1887, reciting the consideration of $15,000. *Titus G. Fish* was one of the directors of said company. He was present at a meeting thereof, May 12, 1887, and on that day entered into a written agreement with said Johnson, reciting that Johnson had advanced money to purchase claims against the business of Fish Bros. & Co., and to purchase the real and personal assets of said business, and had transferred the said

property to *Fish Bros. Wagon Company,* being the plaintiff corporation herein, and that he held substantially all of the capital stock of the corporation,— therefore it was mutually agreed that said *Titus G. Fish* should give his entire time and efforts to making said assets productive,— and containing an optional right to purchase by him from Johnson. On the same day Johnson and wife conveyed said real estate, including the factory and buildings situated thereon, to the plaintiff company. On July 17, 1887, said Hall, as such receiver, made a further deed to said *Fish Bros. Wagon Company,* the plaintiff herein. On August 1, 1887, *Titus G. Fish* and Johnson entered into an agreement extending the former agreement between them to July 1, 1888, and the same was afterwards extended to December 1, 1888, by written agreement. *Titus G. Fish* was present and participated in a directors' and stockholders' meeting of the plaintiff company held October 24, 1887. On November 7, 1887, Hall, as such receiver, made a further deed of such property to said plaintiff company. At a meeting of the directors of the company, August 13, 1888, said Huggins was elected a director and treasurer of said company. On December 29, 1888, *Titus G. Fish* verbally agreed to take 500 shares of the capital stock of the plaintiff company, and certificates therefor were issued, but not paid for, and were finally canceled April 2, 1889. At a stockholders' meeting of the plaintiff company held January 21, 1889, *Titus G. Fish* and said Huggins participated, and each was elected a director for another year; and thereupon said directors elected said Huggins vice president and general manager, and said *Titus G. Fish* secretary, of said plaintiff company. At a stockholders' meeting of the plaintiff company held March 30, 1889, the stock of said *Titus G. Fish* was voted by a proxy. At the same meeting he presented his resignation as a director and secretary of the company, and the same was accepted. *Edwin B.*

*Fish* continued in the employ of the plaintiff company until June 17, 1890, when he went out.

On June 17, 1890, *Titus G. Fish, Edwin B. Fish,* and *Fred. C. Fish* entered into copartnership by an agreement in writing to prosecute the business of manufacturing or procuring to be manufactured and dealing in wagons and other vehicles, under the firm name of Fish Bros. & Co., *Titus G. Fish* to have a one-half interest and *Edwin B.* and *Fred. · C.* each a one-fourth interest therein. It was provided therein that each party was at liberty to engage in other business on conditions named. Said business was to be located and conducted at such place as they might mutually deem advantageous. On the same day the said *Titus G., Edwin B.,* and *Fred. C. Fish,* of Racine, under the name of Fish Bros. & Co., entered into an agreement with the defendant the *La Belle Wagon Works,* a corporation then organized and existing under the laws of Wisconsin, in Douglas county, to the effect that said *La Belle Wagon Works* therein agreed to manufacture for said Fish Bros. & Co., and to deliver to such persons as may be by them designated and accepted, farm wagons to be known as " Fish Bros. & Co. Wagons," and to be marked on the rear axle " Fish Bros. & Co.," and upon the side of the box " Fish Bros. & Co. Wagon," said wagons to be manufactured of material and pattern selected and designated by said Fish Bros. & Co., and the manufacture thereof to be under their supervision and direction, and of the net proceeds thereof Fish Bros. were to have two and one-half per cent., and the *La Belle Wagon Works* the balance; that the *La Belle Wagon Works* were to have the exclusive right to fix prices on all wagons sold, and to reject any and all orders of persons unworthy of credit, unless they paid cash; that Fish Bros. & Co. were to save harmless the *La Belle Wagon Works* from any and all litigation which might thereafter be instituted against it by reason of the manufacture or sale of said Fish

Bros. & Co. wagon; that said *Titus G. Fish* was to be employed as superintendent of sales and collection by said *La Belle Wagon Works*, under the supervision and instruction of its board of directors, and to have a salary of $3,000 per year, and that *Edwin B. Fish* was to have a salary of $1,500 per year, and *Fred. C. Fish* a salary of $1,000 per year, with other stipulations; and it was therein agreed that said contract should terminate June 17, 1900, subject to the provisions therein contained. The contract was signed by each of the members of said firm of Fish Bros. & Co. and by said corporation.

Thereupon *Titus G., Edwin B.,* and *Fred. C. Fish,* under the firm name of Fish Bros. & Co., issued a circular addressed "To Our Old Customers and the Implement Trade," stating, among other things, that they desired to advise them of the change of location and change in their firm name; that the firm of Fish Bros. & Co., of South Superior, Wis., succeeds *Titus G. Fish,* of Fond du Lac, Wis., the senior member and head of the present firm, comprising *Titus G., Edwin B.* (Fish Bros.), and *Fred. C. Fish,* formerly of Racine, Wis.; and stating that for the first time since 1883 they were able to furnish their patrons with "the genuine Fish Bros. & Co. wagon, fully up to our old standard of that date;" that their experience of over a quarter of a century in the manufacture of farm wagons for each and every section of the United States had led them into quarters where they found the best advantages for the manufacture of first-class wagons; that they were located in the finest timber belt in the country, and using the best hard-wood timber; and they guarantied the trade a wagon made of a first-class butt-cut stock, thoroughly dry; that their former patterns and styles had been changed in but a few minor particulars, and then only where they could find opportunity to do better work; and inviting the trade of their old customers.

On or about July 27, 1891, the plaintiff commenced this action for the purpose of restraining the defendants herein from using the words "Fish Bros.," "Fish Bros. & Company," "Fish Bros. Wagons," the picture of a fish with "Bros.," "Brothers," "Bros. & Co." printed thereon, or in advertising their wagons, and that the plaintiff be adjudged to have the exclusive right to the same as trade-marks. Upon the application of the plaintiff for a preliminary injunction thereon, and on August 17, 1891, the court ordered, in effect, that the defendants be enjoined and restrained until the further action of the court from using the words "Fish Bros.," "Fish Bros. Wagons," or the trade-mark or device consisting of the picture of a fish with the words "Bros." or "Brothers" or "Bros. & Co." printed thereon, or from in any wise using said words, phrases, or devices, or any of them, in any way designating any wagons or vehicles, or printing, publishing, circulating, or distributing catalogues containing such words in imitation of the plaintiff, or in any way giving out that the defendants, or any of them, are the manufacturers of or dealers in, or authorized to manufacture or deal in, Fish Bros. wagons, or to use the words "Fish Bros." or "Fish Bros. Wagons" in designation of their manufacture. Thereupon the defendants moved to dissolve said injunction, upon affidavits, etc., whereupon the court, September 13, 1891, ordered that so much of said temporary injunction as enjoins the defendants, or any of them, from using in their business of making and selling wagons or other vehicles the words "Fish Brothers & Company," "Fish Bros. & Co.," or either of them, is hereby dissolved, annulled, and set aside, upon giving the requisite bond. Thereupon the defendants answered upon the merits and by way of counterclaim, and asked a counter injunction restraining the plaintiff from using the words "Fish Brothers, "Fish Bros." or "Fish Brothers Wagons," or the picture of a fish with the words "Fish

Brothers" or "Bros." or "Fish Brothers & Company" or "Fish Bros. & Co." stamped thereon. Thereupon these defendants moved the court, November 12, 1891, for an order setting aside and vacating the injunctional order theretofore entered on the plaintiff's application, and for a temporary restraining order in favor of the defendants. From an order denying that motion the defendants appeal.

For the appellants there were briefs by *Turner & Timlin* and *Ross, Dwyer & Smith,* and oral argument by *W. J. Turner.* No matter how long *Fish Brothers* may have permitted the plaintiff or others to use the trade-mark and trade name, they do not thereby lose their exclusive right to the same. Such user creates only the relation of licensor and licensee. *McCardel v. Peck,* Cox, Trade-mark Cas. 312; *Stevens v. De Conto,* id. 445; Browne, Trade-marks, sec. 364. By permitting another to use his trade-mark a man does not lose his ownership of it, even though such user may be by him in conjunction with his partner. *Kidd v. Johnson,* 100 U. S. 617, 619; *Huwer v. Dannenhoffer,* 82 N. Y. 499; *Hazard v. Caswell,* 93 id. 259. The good will of an established and successful business is undoubtedly of much value to the possessor of such business and may be sold with it. But, while such sale will entitle the purchaser to a certain limited protection, it will not of itself alone be sufficient to preclude the seller from engaging in a separate and independent business of the same kind in the same village or city. *Washburn v. Dosch,* 68 Wis. 439; *Bergamini v. Bastian,* 48 Am. Rep. 216. The defendants *Fish* have the right to use their own name in their business, notwithstanding the organization of the corporation. *Marshall v. Pinkham,* 52 Wis. 585; *Carmichel v. Latimer,* 11 R. I. 395, 23 Am. Rep. 481; *Symonds v. Jones,* 17 Am. St. Rep. 496. It is only when an individual name becomes an adjective as describing the article sold as distinguished from the personal work or supervision employed in the manufacture,

that it can be transferred as a trade-mark or trade name. *Symonds v. Jones*, 17 Am. St. Rep. 496; *Connell v. Reed*, 128 Mass. 477; *Manhattan Medicine Co. v. Wood*, 108 U. S. 218; *Kidd v. Johnson*, 100 U. S. 617; *Wilmer v. Thomas*, 74 Md. 485; *Meriden Britannia Co. v. Parker*, 39 Conn. 450. The right of a person to use his name as a brand is a personal right and does not pass to his assignee in bankruptcy. *Mattingly v. Stone*, 12 S. W. Rep. (Ky.), 467; *Wolfe v. Barnett*, 13 Am. Rep. 113. The plaintiff does not come into court with clean hands, and is therefore not entitled to any relief in the action. Browne, Trade-marks, secs. 474, 525, 534; *Stachelberg v. Ponce*, 23 Fed. Rep. 430; *Symonds v. Jones*, 17 Am. St. Rep. 493; *Manhattan Medicine Co. v. Wood*, 108 U. S. 218. "A lack of truth debars a trade-mark from protection. The tale told by the symbol must be sincere. The instant it ceases to be truthful in spirit as well as letter, it becomes an instrument of fraud and is not lawful." Browne, Trade-marks, secs. 71, 437, 474, 477–8, 484, 525; *Siegert v. Abbott*, 61 Md. 276; *Samuel v. Berger*, 24 Barb. 164; *Leather Cloth Co. v. Am. L. C. Co.* 4 De Gex, J. & S. 137, 11 H. L. Cas. 544; *Koehler v. Sanders*, 122 N. Y. 65; *Sherwood v. Andrews*, 5 Am. Law Reg. 588; *Pidding v. How*, 8 Sim. 477. The defendants had the right to use their own name in the business, and they had the right to refer to their personal reputation to secure further business, and also the right to refer to the superior quality of goods theretofore manufactured by them. *Hazelton Boiler Co. v. Hazelton Tripod Boiler Co.* 30 N. E. Rep. (Ill.), 339. The court ought to have granted the injunction asked for by the defendants restraining the plaintiff from using the words "Fish Brothers," etc., or the picture of a fish with the word "Brothers" stamped thereon, upon the wagon, and from using such words and marks in its advertisements, and from indicating in any way that its goods are manufactured by or under

the supervision of the defendants *Fish*; and ought to have required the plaintiff to indicate by some proper designation upon its goods, circulars, etc., that its wagons were not manufactured by or under the supervision of *Fish* brothers.

For the respondent there were briefs by *Quarles, Spence, Hoyt & Quarles,* and oral argument by *Charles Quarles.* The rebus and brands used by plaintiff are trade-marks, and the words "Fish Bros. Wagon" and "Fish Wagon" are trade names. They "point out the true source, origin, or ownership of the goods to which the mark is applied, and point out and designate the dealer's place of business." *Marshall v. Pinkham,* 52 Wis. 572, 578; *Dunbar v. Glenn,* 42 id. 118; *McLean v. Fleming,* 96 U. S. 245–254; *Canal Co. v. Clark,* 13 Wall. 311; *Lawrence Mfg. Co. v. Tenn. Mfg. Co.* 31 Fed. Rep. 783. As to the distinction and difference between a trade-mark and a trade name, see Rapalje & L. Law Dict. tit. TRADE NAME. The word or phrase, whether arbitrary or descriptive, will be protected when it has come to be a short name used between the buyer and seller to designate the article sold, as "Glenfield Starch," *Wotherspoon v. Currie,* L. R. 5 Eng. & Ir. App. Cas. 521; "*Appolinaris,*" 14 Blatchf. 380; "*The Chatterbox,*" 21 Fed. Rep. 189; "*Durham,*" 3 Hughes, 151, 17 Am. L. Reg. (N. S.), 516; "*Lone Jack,*" 1 Fed. Rep. 688; "*Bethesda,*" 42 Wis. 118; "*Thorley's Cattle Food,*" 14 Ch. Div. 756 (37 Moak's Eng. 77); "*Day & Martin's Blacking,*" 7 Beav. 84; "*Sapolio,*" 43 Fed. Rep. 420. The trade name is impersonal and belongs to the factory. *Filley v. Fassett,* 44 Mo. 169, 100 Am. Dec. 275; *Pepper v. Labrot,* 8 Fed. Rep. 29–41; *Hall v. Barrows,* 4 De Gex, J. & S. 157; *Motley v. Downman,* 3 Mylne & Cr. 1; *Kidd v. Johnson,* 100 U. S. 620; *Wotherspoon v. Currie,* L. R. 5 Eng. & Ir. App. Cas. 521; *Bury v. Bedford,* 4 De Gex, J. & S. 368. The right to use a trade-mark or trade name can be founded only upon actual user. Neither adoption nor claim of right

can confer the right. *Trade-Mark Cases*, 100 U. S. 82–94; *Candee v. Deere*, 54 Ill. 439. This right is in the plaintiff both by purchase and by estoppel. A trade-mark constitutes part of partnership assets, and may properly be sold with the firm property. *Morgan v. Rogers*, 19 Fed. Rep. 596, and cases cited. Where a trade-mark is used to designate the place and the person by whom the goods are made, the right to such trade-mark passes to the purchaser upon the sale and transfer of the business and manufactory at which the goods are made. *Witthaus v. Mattfeldt*, 44 Md. 303–305; *Pepper v. Labrot*, 8 Fed. Rep. 41. The office thenceforward of the trade name is to refer to the origin of the product, that is, to the factory, and no one except the owner of the factory can use the name without practicing a deception upon the public. *Pepper v. Labrot, supra; Chaney v. Hoxie*, 143 Mass. 592. The claim that the trade-mark and trade name did not pass to the plaintiff, is against conscience. Broom's Legal Max. 169; *Dickerson v. Colgrove*, 100 U. S. 578–580; *Dair v. United States*, 16 Wall. 1–4; *Gregg v. Von Phul*, 1 id. 274–281. There is no misrepresentation in the plaintiff's use of the trade-mark and trade name. By such use, the plaintiff, according to the ordinary usages of trade, " is not to be understood as saying more than that it is carrying on the same business as had been formerly carried on by the person whose name constituted the trade-mark." *Leather Cloth Co. v. Am. L. C. Co.* 11 Jur. N. S. 513; *Oakes v. Tonsmierre*, 49 Fed. Rep. 447–451; *Marshall v. Pinkham*, 52 Wis. 572–582; *Russia Cement Co. v. Le Page*, 147 Mass. 206–209; *William Rogers Mfg. Co. v. Rogers & S. Mfg. Co.* 11 Fed. Rep. 495–499. When the plaintiff in any way, by purchase or otherwise, succeeded to the business of the original Fish Bros. and their successors, it had the exclusive right to use the trade-mark and the trade name to indicate that it was carrying on the same business. *Witthaus v. Mattfeldt*, 44 Md. 303–

305; *Bury v. Bedford*, 4 De Gex, J. & S. 368; *Kidd v. Johnson*, 100 U. S. 617–620; *Chaney v. Hoxie*, 143 Mass. 592; *Pepper v. Labrot*, 8 Fed. Rep. 41; *Massam v. Thorley's Cattle Food Co.* 14 Ch. Div. 748–755. The use made by the defendants of the trade-mark and trade name is fraudulent and in violation of the plaintiff's right, and entitles it to an injunction. *Marshall v. Pinkham*, 52 Wis. 572, 586–587; *Welch v. Knott*, 4 Kay & J. 747; *Millington v. Fox*, 3 Mylne & Cr. 338; High, Injunctions, sec. 1087; *Wotherspoon v. Currie*, 3 Moak's Eng. 29–36; *Croft v. Day*, 7 Beav. 84–88. It is apparent that the defendants by their combinations and doings have attempted and are attempting to steal away the business of the plaintiff for the benefit of the defendants. Whenever and however this is done, whether by active misrepresentation or by silence when one should speak, or by any kind of springe, automatic or otherwise, to catch the unwary, a court of chancery will interfere and prevent the fraud. *Morgan's Sons. Co. v. Wendover*, 43 Fed. Rep. 420; *Celluloid Mfg. Co. v. Cellonite Mfg. Co.* 32 id. 97; *McLean v. Fleming*, 96 U. S. 245, 251–2, 255; *Newman v. Alvord*, 51 N. Y. 192; *Lawrence Mfg. Co. v. Tenn. Mfg. Co.* 138 U. S. 537–539; *Thompson v. Montgomery*, 41 Ch. Div. 35–50; *Partridge v. Menck*, 2 Barb. Ch. 101, 103. The fact that certain of the defendants are using their own names, does not justify them. *Massam v. Thorley's C. F. Co.* 14 Ch. Div. 748–760; *Rogers v. Rogers*, 53 Conn. 121; *William Rogers Mfg. Co. v. Rogers & S. Mfg. Co.* 11 Fed. Rep. 495–499; *Levy v. Walker*, 10 Ch. Div. 447; *Shaver v. Shaver*, 54 Iowa, 208–211; *Croft v. Day*, 7 Beav. 84; Cook, Stock. (2d ed.), sec. 699, note 2; *Newby v. O. C. R. Co.* Deady, 609–616; *Lehigh Valley Coal Co. v. Hamblen*, 23 Fed. Rep. 225; *Holmes, B. & H. v. Holmes, B. & A. Mfg. Co.* 37 Conn. 278–293; *Hazelton Boiler Co. v. Hazelton Tripod Boiler Co.* 30 N. E. Rep. (Ill.), 339.

Fish Bros. Wagon Co. vs. La Belle Wagon Works and others.

CASSODAY, J.   The plaintiff, *Fish Bros. Wagon Company*, was incorporated in January, 1887, and since that time has been engaged in the manufacture of wagons at Racine, and selling the same throughout the country.   The defendant *La Belle Wagon Works* and the other defendants have since June 17, 1890, been engaged in the manufacture of wagons at South Superior, and selling the same in different parts of the country.   This suit was commenced in July last to restrain the defendants from using the words " Fish Bros.," " Fish Bros. & Co.," " Fish Bros. Wagons," and the picture of a fish as trade-marks on the wagons and in the advertisements of the defendants, on the ground that the plaintiff has the exclusive right to the same.   The defendants, insisting upon the right to use such words, counterclaim an exclusive right to the same, and ask for an injunction accordingly.   The history of the use of those words by the firm of Fish Bros. and Fish Bros. & Co. as copartners at Racine up to the time when Mr. Case became the ostensible owner or mortgagee, and from that time down to October 16, 1883, in connection with the word "Agents," when he was appointed receiver of all the property and assets connected with that business, and from that time down to September 26, 1885, when he was superseded by Mr. Hall as such receiver, and from that time down to 1887, when all the property and assets connected with the business were sold by the receiver and the parties interested to the plaintiff company, is sufficiently set forth in the foregoing statement.

The first question presented is whether the plaintiff, by such purchase and subsequent use, acquired the right to continue the use of such words and pictures on their wagons and in their advertisements, as trade-marks, as indicated.   Two of the Fish brothers, *Titus G.* and *Edwin B.*, and Huggins, of the firm of Fish Bros. & Co., remained in the business as managers under such receivers, not only down

to such transfer of the property and assets to the plaintiff company, but for more than two years thereafter, acting as directors and officers of the plaintiff company. Such conduct on their part was a continued sanction of the use of such words and symbols as trade-marks on the plaintiff's wagons sold during the time throughout the country, and advertisements of the same. It is conceded that the office of a trade-mark is to point out the true source, origin, or ownership of the goods to which the mark is applied, or to point out and designate a dealer's place of business, distinguishing it from the business locality of other dealers. *Marshall v. Pinkham*, 52 Wis. 578; *Gessler v. Grieb*, 80 Wis. 24. "Such trade-mark usually includes the name of the manufacturer or dealer as the best designation of such source, origin, ownership, or place of business. Sometimes, however, it consists of some novel device, arbitrary character, or fancy word, applied without special meaning, and which, by use and reputation, comes to serve the same purpose." *Gessler v. Grieb*, 80 Wis. 25, and cases there cited. From these several authorities it is obvious that a trade-mark may perform one or more of three several functions, depending upon what it is and its manner of use. One of these is to point out the true source or origin of the goods to which the mark is applied. Manifestly, the words "Fish Bros." and "Fish Bros. & Co.," as used, pointed out *Titus G.* as the founder, and him and his brothers and other members of the firm as originators, of the particular make and style of wagon and vehicle first manufactured by them, and afterwards by them as agents, and subsequently by receivers and the plaintiff, under their supervision or with their acquiescence, at Racine. The mere fact that each and all of the *Fishes* withdrew from that business did not prevent the words mentioned from continuing to point to the old place of business and the old firm of Fish Bros. and Fish Bros. & Co., at Racine, as the true source and origin

of their particular make and style of wagon and vehicle to which the plaintiff company succeeded, and continued to manufacture, at Racine.

It is true that one of the functions of a trade-mark is to point out the true ownership of the goods or articles to which it is applied, and that the words "Fish Bros." and "Fish Bros. & Co." partially ceased to perform that office when Mr. Case became the ostensible owner or mortgagee, and still more so when the legal title passed to the receivers, respectively, and finally became extinct when the property and assets became vested in the plaintiff; but such extinction did not prevent those words from performing the two other functions of a trade-mark mentioned. As indicated, one of these is to point out and designate the dealer's place of business, distinguishing it from the business locality of other dealers. Such trade-mark is, in effect, an extension or perambulation of the dealer's trade sign. It advertises the home business to all who may observe the article on sale or in use in other parts of the country. It attaches to every such article on sale or in use the reputation it has acquired with the trade, and informs all observers desiring a like article where the manufacturer or dealer may be found. The picture of a fish and the manner of its use, as well as the words mentioned, designated not only the plaintiff's place of business at Racine, but also the true source and origin of the make and style of the wagons and vehicles so previously made by Fish Bros. and Fish Bros. & Co., as agents, and under the receivers at Racine, and hence may fairly be regarded as trade-marks for the plaintiff, even after all the *Fishes* had withdrawn from that business.

Upon the facts in this case, as found in the foregoing statement, and the law applicable, we are constrained to hold that the plaintiff acquired the good will of the business, including the right to use the picture and words men-

tioned as trade-marks, notwithstanding they were not specifically named in any of the transfers or conveyances to the plaintiff. Thus in *Menendez v. Holt*, 128 U. S. 514, it was in effect held that when a partner retires from a firm, assenting to or acquiescing in the retention by the other partners of the old place of business and the future conduct of the business by them under the old firm name, the good will of the business including the trade-marks remain with the latter, as of course. To the same effect, *Merry v. Hoopes*, 111 N. Y. 415; *In re Wellcome's Trade-Mark*, 32 Ch. Div. 213; *Howie v. Chaney*, 143 Mass. 592; *Witthaus v. Mattfeldt*, 44 Md. 303; *Morgan v. Rogers*, 19 Fed. Rep. 596.

In quoting from Lord CRANWORTH it was said in *Marshall v. Pinkham*, 52 Wis. 581, that "difficulties, however, may arise where the trade-mark consists merely of the name of the manufacturer. When he dies, those who succeed him (grandchildren, or married daughters, for instance), though they may not bear the same name, yet ordinarily continue to use the original name as a' trade-mark, and they would be protected against any infringement of the exclusive right to that mark. They would be so protected, because, according to the ways of the trade, they would be understood as meaning *no more*, by the use of their grandfather's or father's name, *than that they were carrying on the manufacture formerly carried on by him.* Nor would the case be necessarily different if, instead of passing into other hands by devolution of law, the manufactory *were sold and assigned to a purchaser.* The question in every such case must be whether the purchaser, in continuing the use of the original trade-mark, would, according to the ordinary usages of trade, be understood as saying more than that he was carrying on the same business as had been formerly carried on by the person whose name constituted the trade-mark." *Leather Cloth Co. v. American Leather Cloth Co.* 11 Jur. (N. S.), 513; *Hazard v. Caswell*, 93 N. Y. 259.

2. But the more serious question is whether such right is exclusive. Notwithstanding the good will of an established and successful business may be sold in connection with the property and assets, so as to entitle the purchaser thereof to a certain limited protection, yet such transfer will not of itself alone be sufficient to preclude the seller from engaging in a separate and independent business of the same kind, and to solicit the customers of the old business, even in the same city or village, much less in a city or village 200 miles or more distant. " In order to preclude the seller from engaging in such separate and independent business, there must be an agreement to that effect, based upon a good and valuable consideration, and not contrary to law or public policy." *Washburn v. Dosch*, 68 Wis. 439, and cases there cited; *Williams v. Farrand*, 88 Mich. 473; *Vernon v. Hallam*, 34 Ch. Div. 748. True, the transfer of the good will to the plaintiff included the trademarks; but it is to be remembered that a trade-mark gives no exclusive right to the device or article to which it is applied. It is in no sense a patent, and gives the proprietor thereof no exclusive right or monopoly of the thing manufactured and sold. The theory upon which actions for the infringement of trade-marks are maintained is that the law will not allow one person to sell his own goods as and for the goods of another. *Marshall v. Pinkham*, 52 Wis. 580. To the same effect is *Lawrence Mfg. Co. v. Tenn. Mfg. Co.* 138 U. S. 537; *Jay v. Ladler*, 40 Ch. Div. 649. It is only the dealer's *own* trade and *his* own business which are thus to be protected by *his* own trade-mark. *Gessler v. Grieb*, 80 Wis. 25. It does not relate to the nature, quality, or mode of operation of the thing sold, but merely to the designation, name, or mark by which it is sold. Such being the functions of a trademark, it is obvious that the plaintiff's right to the marks in question would not be infringed by the manufacture and sale of wagons and vehicles of similar make and style by

any person, even in Racine, much less by the *Fish* brothers themselves at South Superior.

The right of the defendants to manufacture and sell similar wagons and vehicles being admitted, as it must, the question remains whether they also had the right to affix thereto the words " Fish Bros.," " Fish Bros. & Co.," and the picture of a fish. The picture of a fish, as used, must be regarded simply as another way of designating the surname " Fish " as the founder and originator of the particular make of wagons and vehicles thus manufactured and sold. In *Burgess v. Burgess*, 17 Eng. L. & Eq. 257, 17 Jur. 292, John Burgess and his son William R., as partners under the firm name of " John Burgess & Son," sold " Burgess' Essence of Anchovies " at No. 107 Strand. The father died, and the son, William R., continued the same business, selling the same article at the same place, in the name of the old firm. William R. had a son William H., whom he employed in the business on a salary. Subsequently William H. left the employ of his father, and went into the same business for himself, selling the same article under the same name, but at a lower price, and advertised the same as " Late of 107 Strand." The father filed a bill in equity to restrain the son from conducting that business in that way, and in giving the opinion of the court KNIGHT BRUCE, L. J., said: " All the queen's subjects have a right, if they will, to manufacture and sell pickles and sauces, and not the less that their fathers have done so before them. All the queen's subjects have a right to sell them in their own name, and not the less so that they bear the same name as their fathers; and nothing else has been done in that which is the question before us. . . . He [the defendant] carries on business under his own name, and sells essence of anchovy as ' Burgess' Essence of Anchovy,' which it is. . . . The only ground of complaint is the great celebrity, which, during many years, has been

possessed by the elder Mr. Burgess' essence of anchovy. That does not give him such exclusive right, such a monopoly, such a privilege, as to prevent any man from making essence of anchovy and selling it under his own name." The court did, however, restrain the son from advertising as " Late of 107 Strand." See *Marshall v. Pinkham*, 52 Wis. 583–586, and other cases there cited. In *Brown Chemical Co. v. Meyer*, 139 U. S. 540, it was held that " an ordinary surname cannot be appropriated as a trade-mark by any one person as against others of the same name who are using it for a legitimate purpose; although cases are not wanting of injunctions issued to restrain the use even of one's own name, where a fraud upon another is manifestly intended, or where he has assigned or parted with his right to use it. The owner of a trade-mark, bearing his own name, which is affixed to articles manufactured at a particular establishment, may in selling the latter confer upon the purchaser exclusive authority to use the trade-mark." In the case at bar there is no agreement giving such exclusive right to the plaintiff, and hence we must conclude that the defendants are at liberty in good faith to apply to the wagons and other vehicles manufactured by them the words " Fish Bros.," or " Fish Bros. & Co.," or the picture of a fish, provided they do it in a way not calculated to induce persons to buy the same as and for those manufactured by the plaintiff at Racine.

3. The defendants ask to enjoin the plaintiff from the use of those words and that device as a trade-mark in their business at Racine. In *Thynne v. Shove*, L. R. 45 Ch. Div. 577, the plaintiff, A. Thynne, sold his stock in trade and business of a baker, and the good-will thereof, including *trade cards* bearing the name of " A. Thynne, Baker," to the defendant. The deed and transfer contained an assignment of " all the beneficial interest and good will of the said Arthur Thynne in the said trade or business," but

contained no express assignment of the right to use the plaintiff's name. After the purchase the defendant used the trade cards bearing the plaintiff's name until they were exhausted, and then printed further trade cards bearing the plaintiff's name as before. In an action to restrain the defendant from printing or publishing any such cards, or otherwise trading in the name of the plaintiff, it was held that the defendant, "by virtue of the assignment to him of the good will of the business, was entitled to use the name of the plaintiff for the purpose of showing that the business was that formerly carried on by the plaintiff, but must not so exercise that right as to expose the plaintiff to liability; and held that, under the circumstances, an injunction must be granted to restrain the defendant from using the plaintiff's name in such a way as to expose him to any liability." In the case at bar we discover nothing to indicate that the plaintiff is using the words "Fish Bros." or "Fish Bros. & Co." in a manner to expose any of the defendants to liability. In fact, no claim of that kind is made; and hence so long as the plaintiff uses those words honestly and truthfully, and for the legitimate purpose designed, the defendants have no ground for complaint. On the authorities cited, and others which might be cited, we are constrained to hold that the defendants are not entitled to an injunction against the plaintiff.

On the same theory the defendants have the lawful right to honestly and truthfully state where they formerly resided, the experience they have respectively had, and the skill they respectively possess in the manufacture of wagons and other vehicles; but they have no right to represent their present business as the same which they formerly conducted at Racine. The circular addressed "To Our Old Customers and the Implement Trade," issued by Fish Bros. & Co., and mentioned in the complaint and the foregoing statement, is, to a limited extent, objectionable on this

Fish Bros. Wagon Co. vs. La Belle Wagon Works and others.

ground; as, for instance, where it speaks of their "change of location" and "firm name,". Fish Bros., "formerly of Racine, Wis.," and for the "first time since 1883 we shall be able to furnish our patrons with the *genuine* Fish Bros. & Co. wagon, fully up to our old standard of that date." But the defendants may truthfully and in good faith publish the good qualities and material of the wagons and vehicles manufactured by them, and their superior facilities for the manufacture of the same at South Superior. In other words, their advertisements and marks must truthfully and in good faith refer to their own manufactures, trade, and business, and not to those of the plaintiff.

*By the Court.*— The order of the circuit court is reversed, and the cause is remanded for further proceedings according to law.

Winslow, J. I agree that the words " Fish Bros. Wagon " and the rebus of the fish were trade names or labels appertaining to the business transacted at the Racine factory, and that the right to use such names or labels upon wagons was acquired by the plaintiff by its purchase of that business.

Such a right is, in its very nature, exclusive, and if the plaintiff owns it the defendants manifestly do not own it. In my judgment, the defendants have no right to mark their wagons with either the words or the rebus.

Probably they have the right to use the firm name "Fish Bros. & Co.," if they do not use it in such a way as to mislead the public, but this would not give them the right to use a trade name or label on their wagons which is the distinctive mark of the product of the Racine factory, and the right to use which has passed from the defendants *T. G.* and *E. B. Fish* to that concern.

See note to this case in 16 L. R. A. 453.— Rep.